IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., as assignee and subrogee of M-D BUILDING PRODUCTS, INC., <br><br>   Plaintiff <br><br> v. <br><br> MARTIN W. CULVER, W W RECYCLING LLC, and WILSON RECYCLING, LLC, <br><br>   Defendants. | Case No. <br><br> **JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff, National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union") as assignee and subrogee of M-D Building Products, Inc. ("M-D"), files this Complaint against Defendants, Martin W. Culver ("Mr. Culver"), W W Recycling LLC ("W W Recycling"), and Wilson Recycling, LLC (collectively "Defendants"), and alleges as follows:

## THE PARTIES

1. Plaintiff, National Union, is an insurance company formed and existing in accordance with the laws of the Commonwealth of Pennsylvania, with a principal place of business located at 1271 Ave of the Americas FL 37, New York, NY 10020-1304.

2. Defendant, Mr. Culver, is an adult individual residing at 708 E. Patricia Dr., Hayti, MO 63851.

1

3. Defendant, Wilson Recycling, LLC, is a limited liability company formed and existing in accordance with the laws of the State of Missouri, with a registered address located at 217 College Ave., Kennett, MO 63852.

4. After reasonable inquiry, National Union has no reason to believe that any member of Wilson Recycling, LLC is a citizen of Pennsylvania or New York.

5. Defendant, W W Recycling, is a limited liability company formed and existing in accordance with the laws of the State of Missouri, with a registered address located at 1912 Independence Ave., Kennett, MO 63857.

6. After reasonable inquiry, National Union has no reason to believe that any member of W W Recycling is a citizen of Pennsylvania or New York.

## **JURISDICTION**

7. This Court has subject matter jurisdiction over the claims raised in this Complaint pursuant to 28 U.S.C. § 1332.

8. National Union, a citizen of New York and Pennsylvania, does not share state citizenship with Mr. Culver, who is a citizen of Missouri.

9. After reasonable inquiry, National Union has no reason to believe that it shares state citizenship with any member of Wilson Recycling, LLC.

10. After reasonable inquiry, National Union has no reason to believe that it shares state citizenship with any member of W W Recycling.

11. As set forth below, the amount in controversy in this matter exceeds $75,000.

12. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this judicial district.

## FACTS COMMON TO ALL COUNTS

13.     W W Recycling and Wilson Recycling, LLC both engage in the business of metal recycling, whereby they purchase various metals from persons or entities and then process such metals to be recycled.

14.     Upon information and belief, both W W Recycling LLC and Wilson Recycling, LLC trade as "Wilson Recycling" without reference to "LLC."

15.     Accordingly, hereinafter W W Recycling and Wilson Recycling, LLC collectively shall be referred to as "Wilson Recycling."

16.     Wilson Recycling conducts business at the facility located at 2000 Independence Ave., Kennett, Missouri 63857.

17.     M-D is a corporate entity that operates a facility located at 665 Gettings Lane, Hayti, Missouri 63830 (the "Hayti Plant") where M-D engages in the extrusion process for metal products.

18.     From November 24, 2013 to July 20, 2018, Mr. Culver was employed by M-D at the Hayti Plant.

19.     As a result of the operations at the Hayti Plant, M-D generated a significant amount of excess metal that was not incorporated into its finished products.

20.     During Mr. Culver's employment with M-D, M-D had an agreement with a third party pursuant to which M-D would sell the excess metal generated by M-D to the third party for fair market value.

21.     Mr. Culver knew that M-D had an existing arrangement with a third party for the sale of M-D's excess metal.

3

22. From January 2017 through July 2018, Mr. Culver engaged in a scheme whereby he stole excess metal from the Hayti Plant and sold it to Wilson Recycling for far less than fair market value for his own personal gain.

23. During the course of his scheme, Mr. Culver would collect metal from within the Hayti Plant and move it to a secluded area within the facility that was out of view from other M-D employees.

24. Mr. Culver would pile the metal in the secluded area and then cover the pile with pallets in order to further conceal the metal from the view of others.

25. Without M-D's knowledge or authorization, Mr. Culver regularly would load the metal into the bed of his personal Ford F-150 pickup truck and place a tarp over the bed to conceal the metal from the view of others.

26. Mr. Culver then would drive his loaded vehicle from the Hayti Plant to Wilson Recycling's facility.

27. Upon arriving at Wilson's recycling facility, Mr. Culver would sell the stolen metal to Wilson Recycling.

28. Wilson Recycling paid Mr. Culver steeply discounted prices for the metal and rarely if ever paid fair market value for the metal.

29. From January 2017 through July 2018, Mr. Culver traveled to Wilson Recycling's facility one or two times each week to sell the metal that he stole from M-D.

30. Mr. Culver sold large quantities of metal to Wilson Recycling such that the transactions frequently exceeded one thousand pounds of metal.

31. Most of the stolen metal that Wilson purchased from Mr. Culver was a by-product of M-D's metal extrusion process.

32. Much of the stolen metal that Wilson Recycling purchased from Mr. Culver was visibly new.

33. During most transactions with Wilson Recycling, Mr. Culver wore his M-D uniform indicating that he was an M-D employee.

34. Wilson Recycling never inquired of Mr. Culver whether he owned the metal that he presented for sale.

35. Wilson Recycling never inquired about the source of the metal.

36. Wilson Recycling never requested Mr. Culver to provide proof that he was authorized to sell the metal.

37. Wilson Recycling never declined to purchase the metal from Mr. Culver.

38. On numerous occasions, Wilson Recycling paid Mr. Culver in cash for purchases that exceed five hundred dollars.

39. Wilson Recycling made no effort to contact M-D about Mr. Culver's sale of the metal.

40. Wilson Recycling did not attempt to pay M-D by check, money order, wire or any other method by which funds would be provided to M-D rather than to Mr. Culver.

41. During the 80 week period from January 5, 2017 through July 17, 2018, Wilson Recycling purchased stolen metal from Mr. Culver on no less than 120 occasions.

42. From January 5, 2017 through July 17, 2018, Wilson Recycling paid Mr. Culver a total $67,290.60 for the metal that Mr. Culver stole from M-D.

43. Although Wilson Recycling only paid Mr. Culver $67,290.60 for the metal, the fair market value of the metal was $173,735.13.

44. On July 19, 2018, employees of M-D discovered a concealed pile of metal that Mr. Culver had created at the Hayti Plant.

45. Upon discovering the pile of metal, M-D suspected that Mr. Culver may have been stealing the metal and initiated an investigation.

46. M-D contacted local scrap metal recyclers to inquire whether they had been purchasing metal from Mr. Culver.

47. Bridgett Barnett, an employee of M-D, contacted Wilson Recycling and a Wilson Recycling representative disclosed to her that Wilson Recycling regularly was purchasing metal from Mr. Culver.

48. On the morning of July 20, 2018, Michael Wargo, the Plant Manager of the Hayti Plant, traveled to Wilson Recycling's facility to further investigate the theft of the metal.

49. On the same morning, Mr. Culver notified M-D that he needed to leave the Hayti Plant temporarily for a medical appointment.

50. Upon arriving at Wilson Recycling, Mr. Wargo observed Mr. Culver at the facility in his personal vehicle with a tarp covering the bed of his pickup truck.

51. Mr. Wargo waited for Mr. Culver to leave Wilson's facility, at which time Mr. Wargo entered Wilson Recycling's facility and confirmed that Mr. Culver had sold metal to Wilson Recycling that was stolen from M-D.

52. Upon returning to the Hayti Plant., Mr. Wargo and fellow Plant Manager, Brian Kuykendoll, confronted Mr. Culver about his theft.

53. Mr. Culver confessed to the entirety of his scheme to Mr. Wargo and Mr. Kuykendoll.

54. As a result of the theft, M-D terminated Mr. Culver's employment.

55. As a result of Mr. Culver's theft scheme, M-D incurred a total loss of no less than $173,735.13, representing the amount that M-D would have received had the metal been sold to the company with which M-D had the agreement.

56. M-D reported Mr. Culver's theft to law enforcement.

57. Mr. Culver admitted to Officer Ward of the Hayti Police Department, to stealing metal from M-D, selling it to Wilson Recycling and using the proceeds of the sales to pay off debts and to purchase controlled substance.

58. Mr. Culver was criminally convicted for his theft of metal from M-D and sentenced to prison.

59. National Union issued a policy of insurance (the "Policy") to M-D, in which National Union agreed to insure M-D for losses sustained due to employee dishonesty.

60. Pursuant to the Policy, National Union indemnified M-D for the loss that it sustained as a result of Mr. Culver's theft.

61. As a result of indemnifying M-D, National Union has become subrogated to M-D.

62. Additionally, M-D assigned to National Union all of the rights, claims, and causes of action that it has against Mr. Culver, his associates, beneficiaries, and any other persons, corporations or other entities that were involved or benefited from his scrap metal theft, which would include Wilson Recycling.

**COUNT ONE**
**Conversion**
(*All Defendants*)

63. M-D owned the metal that was located in the Hayti Plant.

64. Mr. Culver improperly and without lawful reason or justification took possession of M-D's metal and exercised control over it.

7

65. By accepting M-D's stolen metal from Mr. Culver, Wilson Recycling took possession of M-D's metal and exercised control over it.

66. The Defendants' possession and dominion of the metal deprived M-D of the right to possess the metal.

67. The value of the metal to M-D was $173,735.13.

68. As a result, M-D suffered an injury in the amount of no less than $173,735.13.

69. Accordingly, Mr. Culver and Wilson Recycling, jointly and severally, are liable and indebted to National Union, as subrogee/assignee of M-D, in the principal amount of at least $173,735.13.

## COUNT TWO
### Breach of the Duty of Loyalty
(*Mr. Culver Only*)

70. As an employee of M-D, Mr. Culver owed M-D a duty of loyalty.

71. Mr. Culver breached his duty of loyalty when he took M-D's metal, without M-D's knowledge or permission, and sold it to Wilson Recycling.

72. As a result, M-D suffered an injury in the amount of no less than $173,735.13.

73. Accordingly, Mr. Culver is liable and indebted to National Union, as subrogee/assignee of M-D, in the principal amount of at least $173,735.13

## COUNT THREE
### Conspiracy to Breach the Duty of Loyalty
(*All Defendants*)

74. Wilson Recycling agreed to purchase the stolen metal from Mr. Culver while disregarding clear indicia demonstrating that the metal was stolen.

75. Wilson Recycling's agreement to purchase the metal stolen by Mr. Culver enabled Mr. Culver to dispose of the stolen metal.

76. Without Wilson Recycling's agreement to purchase the stolen metal from Mr. Culver, Mr. Culver would not have been able to monetize the stolen metal and M-D would not have suffered a loss.

77. As a result of the agreement between Wilson Recycling and Mr. Culver, M-D suffered an injury in the amount of no less than $173,735.13.

78. Accordingly, Mr. Culver and Wilson, jointly and severally, are liable and indebted to National Union, as subrogee/assignee of M-D, in the principal amount of at least $173,735.13.

## COUNT FOUR
### Negligence Per Se - Section 304.240(1)
### (*Wilson Recycling Only*)

79. Pursuant to Missouri Revised Statute Section 304.240(1), "No scrap yard shall purchase any metal that can be identified as belonging to a . . . manufacturer of the metal or item described in this section unless such person is authorized in writing by the . . . manufacturer to sell the metal."

80. The metal that Wilson Recycling purchased from Mr. Culver could be identified as belonging to M-D and not Mr. Culver due to the following facts:

   a. Mr. Culver regularly went to Wilson Recycling to sell metal and had no readily apparent source of obtaining such enormous quantities of metal except from M-D;

   b. Mr. Culver wore his M-D-issued uniform when he sold the metal to Wilson Recycling;

   c. Mr. Culver often arrived at Wilson's facility with a tarp placed over the bed of his pickup truck thereby concealing the metal from open view;

    d.  Nearly all of the metal that Mr. Culver sold to Wilson Recycling was in a new and pure condition that would be typically sold by commercial customers, as opposed to worn or damaged metals that a typical individual customer would sell;

    e.  Nearly all of the metal that Mr. Culver sold to Wilson Recycling was noticeably the by-product of an extrusion process which would have been readily apparent to a Wilson Recycling employee; and

    f.  Mr. Culver sold Wilson Recycling large quantities of metal with the majority of sales exceeding one thousand pounds.

81.  M-D never issued written authorization for Mr. Culver to sell the stolen scrap metal.

82.  Wilson Recycling never obtained or sought to obtain authorization in writing from M-D (or from any other company) stating that Mr. Culver was authorized to sell the metal.

83.  Wilson Recycling violated Section 304.240(1) because it purchased metal from Mr. Culver without authorization in writing from the owner of the metal.

84.  M-D was a member of the class of persons or entities that Section 304.240(1) seeks to protect.

85.  Wilson Recycling's violation of Section 304.240(1) proximately caused M-D to suffer an injury in the amount of no less than $173,735.13.

86.  M-D's injuries in this action are of the kind that Section 304.240(1) was designed to prevent.

87.  Accordingly, Wilson is liable and indebted to National Union, as subrogee/assignee of M-D, in the principal amount of at least $173,735.13.

**COUNT FIVE**
**Negligence Per Se – Section 407.303**
(*Wilson Recycling Only*)

88. Under Missouri Revised Statute Section 407.303(1),

    Any scrap metal dealer paying out an amount that is five hundred dollars or more shall make such payment by issuing a prenumbered check drawn on a regular bank account in the name of the licensed scrap metal dealer and with such check made payable to the person documented as the seller in accordance with this section, or by using a system for automated cash or electronic payment distribution which photographs or videotapes the payment recipient and identifies the payment with a distinct transaction in the register maintained in accordance with this chapter.

89. On numerous occasions, Wilson Recycling violated Section 407.303(1) by paying cash to Mr. Culver for purchases that exceeded $500.00 and not following the requirements of Section 407.303(1).

90. By paying Mr. Culver in cash, Wilson Recycling allowed Mr. Culver to spend the unlawful sale proceeds in a faster and easier manner, which Mr. Culver used to pay debts related to the purchase of controlled substances.

91. Wilson Recycling's cash payments to Mr. Culver enabled Mr. Culver to avoid the Internal Revenue Service or other agencies from detecting his unlawful source of income.

92. Wilson Recycling's cash payments to Mr. Culver increased the difficulty for law enforcement and M-D to trace where and how Mr. Culver spent the proceeds from his sale of the stolen metal.

93. M-D was a member of the class of persons or entities that Section 407.303(1) seeks to protect.

94. Wilson Recycling's violation of Section 407.303(1) proximately caused M-D to suffer an injury in the amount of no less than $173,735.13.

11

95. M-D's injuries are of the kind that Section 407.303(1) was designed to prevent.

96. Accordingly, Wilson Recycling is liable and indebted to National Union, as subrogee/assignee of M-D, in the principal amount of at least $173,735.13.

## COUNT SIX
### Unjust Enrichment
### (All Defendants)

97. Mr. Culver and Wilson Recycling were enriched and benefited from improperly obtaining the stolen metal from M-D.

98. Mr. Culver and Wilson Recycling's enrichment was at the expense of M-D, which was injured in the amount of no less than $173,735.13.

99. It would be unjust to permit Mr. Culver and Wilson Recycling to retain the benefits they obtained through the stolen metal without disgorging such benefits.

100. Accordingly, Mr. Culver and Wilson are liable and indebted to National Union, jointly and severally, as subrogee/assignee of M-D, in the principal amount of at least $173,735.13.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, National Union Fire Insurance Company of Pittsburgh, Pa., requests this Court to enter judgment in favor of Plaintiff and against Defendants, Martin W. Culver, W W Recycling LLC, and Wilson Recycling, LLC, jointly and severally, in the amount of no less than $173,735.13, plus interest and costs, and any other relief that the Court deems just and proper.

|  |  |
|---|---|
|  | **McELROY, DEUTSCH, MULVANEY & CARPENTER, LLP** |
| Date: April 13, 2022 | */s/Matthew Lipman* <br> Matthew A. Lipman, Esquire <br> 1617 JFK Blvd., Suite 1500 <br> Philadelphia, PA 19103 <br> (215) 557-2900 <br> mlipman@mdmc-law.com <br> *Counsel for Plaintiff,* <br> *National Union Fire Insurance Company of Pittsburgh, Pa.* |